FOR PUBLICATION                                    [Dkt. Ent. 70]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

## CAMDEN VICINAGE

```
_____  :
                              :
 Larry Peterson,              :
                              :    Civil Action No.
       Plaintiff,             :    07-2723 (RMB/JS)
                              :
          v.                  :
                              :    OPINION
 Robert D. Bernardi, et. al., :
                              :
       Defendants.            :
                              :
_____  :
```

Appearances:

William H. Buckman, Esq.
Surinder K. Aggarwal, Esq.
The William H. Buckman Law Firm
110 Marter Avenue, Suite 209
Moorestown, NJ 08057

        Attorneys for Plaintiff

Benjamin Clarke, Esq.
Jason D. Attwood, Esq.
Decotiis, Fitzpatrick, Cole, & Wisler, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, NJ 07666

J. Brooks DiDonato, Esq.
Parker McCay
Route 73 & Greentree Road, Suite 401
Marlton, NJ 08053

        Attorneys for Defendants.

**BUMB**, UNITED STATES DISTRICT JUDGE:

In this civil rights action, plaintiff Larry Peterson (the "Plaintiff") alleges that he served 18 years incarceration for a crime he did not commit.  He alleges that the evidence leading to his arrest, indictment, and conviction was fabricated, that the prosecutor's expert exaggerated her findings, and that, even when presented with exonerating evidence, the prosecutor prolonged his incarceration.  Asserting the protections of both absolute and qualified immunity, all defendants (collectively, the "Defendants")[1] now move for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a).  For the following reasons, the motion will be partially granted and partially denied.

BACKGROUND[2]

On March 17, 1989, a Burlington County jury found Plaintiff guilty of felony murder and aggravated sexual assault.  State v. Larry L. Peterson, Indictment No. 87-11-0828-I.  The trial judge then sentenced him to a term of life imprisonment, with 40 years of parole ineligibility.  The Appellate Division and Supreme Court of New Jersey affirmed the conviction and sentence.  State

---

[1] Defendants are: Robert D. Bernardi; Richard Serafin; M. Scott Fitz-Patrick; Michael King; Gail Tighe; Burlington County Prosecutor's Office; Director, State of New Jersey Forensic Laboratory; State of New Jersey.

[2] All background facts are drawn from the parties' Rule 56.1 Statements of Material Fact, [Dkt. Ents. 70:2, 74:1-2, 78:1], and are construed in the light most favorable to Plaintiff.  See Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004).

v. Peterson, No. A-3034-89T4 (App. Div. Nov. 30, 1992), cert'n
denied, 133 N.J. 433, 627 A.2d 1139 (1993).

    **A.**    **The Crime and Investigation**

    Jacqueline Harrison was the victim of the crimes of which
Plaintiff was convicted.  In the early morning of August 24,
1987, Harrison was brutally raped and strangled to death in a
Pemberton Township, New Jersey soybean field.  It was later
reported that Harrison had, the prior evening, consumed cocaine
and engaged in consensual sexual intercourse with two men, David
Sutton and Arthur Walley.

    Investigators identified Plaintiff as a person of interest
within days of Harrison's murder because, according to accounts
of the investigation, witnesses had reported observing suspicious
scratch marks on Plaintiff's arms.  Plaintiff was first
interviewed by investigators four days after the murder, on
August 28, 1987.  Defendant Richard Serafin, a lieutenant with
the Burlington County Prosecutor's Office ("BCPO"), conducted the
first interview, followed by Defendant M. Scott Fitz-Patrick,[3] a
BCPO sergeant, and Edward Ryan, a BCPO investigator.

    Investigators interviewed Robert Elder, an acquaintance of
Plaintiff's, on three separate days beginning August 31, 1987.

---

    [3] Some documents hyphenate the name of Defendant Fitz-
Patrick, while others do not.  Although the Court is unsure of
which form is correct, this Opinion will hyphenate since that is
how the name is reflected on the Court's docket.

Elder submitted to a polygraph examination in the course of the second day's interview, the results of which indicated that he was withholding information.  He thereafter provided new details of a conversation with Plaintiff, which purportedly occurred within hours of Harrison's murder.  He said that Plaintiff admitted to having sex with, assaulting, and choking a woman with a name like the victim's.  Importantly, he said that Plaintiff had confessed to vaginally penetrating the woman with a stick. Notably, investigators had withheld from the public the fact that Harrison had been penetrated with a stick.  On September 21, 1987, investigators obtained statements from Wesley Bishop and Arthur Grooms corroborating Elder's account of his conversation with Plaintiff.

Elder has now recanted his statement.  He says that BCPO investigators -- specifically, Defendants Fitz-Patrick and Michael King -- harassed and intimidated him by appearing repeatedly at his home and workplace and by threatening to prosecute him for Harrison's murder, all to obtain testimony from him to inculpate Plaintiff.  He says that he learned the details of Harrison's murder, including the fact that Harrison had been penetrated with a stick, from investigators speaking outside of the interview room.  Unlike Elder, however, Bishop and Grooms have not recanted their statements, although Bishop does not retain a clear memory of the events.

4

Defendant Gail Tighe, a forensic scientist with the New Jersey State Police, performed a microscopic analysis of hairs found on a broken stick taken from the crime scene. Defendant Tighe concluded that of the seven hairs found on the stick, four "compared" to (that is, shared similarities with) the victim's hair, while three "compared" to Plaintiff's hair.

The Pemberton Police filed a criminal complaint against Plaintiff on September 22, 1987. Plaintiff was then arrested pursuant to a valid warrant. Two months later, on November 18, 1987, the case was presented to a grand jury. Defendant Serafin testified before the grand jury that Plaintiff had admitted to the murder in a conversation with Elder. He also explained Defendant Tighe's scientific analysis as finding that the hair from the crime scene was "identical" to Plaintiff's hair. The grand jury returned an eight-count indictment. Plaintiff maintains that Defendant Serafin's testimony mischaracterized Elder's statement and Defendant Tighe's findings.

In addition, Plaintiff maintains that BCPO investigators failed to pursue important leads. Specifically, Plaintiff avers that investigators failed to interview a number of people with whom Harrison had contact in the hours before her murder, including three individuals who sold cocaine to her. Also, Plaintiff avers that BCPO inadequately investigated individuals who attended a party on the night of the murder at a housing

development nearby the crime scene, including one individual, Hassan Hartfield, who Plaintiff had implicated in interviews with police.  Plaintiff further avers that BCPO inadequately investigated two individuals, Kenneth Dixon and James Threadgill, who had been apprehended by the Hamilton Township Police Department for several robberies.  Defendants dispute each of these averments.

**B.    The Trial**

Plaintiff's trial commenced in February 1989 before Judge Cornelius P. Sullivan.  At trial, Plaintiff was represented by attorneys John Furlong and John L. Call, Jr.  Elder, Grooms, and Bishop testified to hearing Plaintiff make self-incriminating statements shortly after the murder.  Defendant Tighe also testified about her findings.  Notably, she did not dispute the prosecutor's use of the term "match" (rather than "compare") to characterize her findings, and she agreed that hair from the crime scene "ha[d] been identified as . . . belonging to" Plaintiff.  (Trial tr., Mar. 6, 1989, 152:1-18 [Pl.'s Ex. 26].) Plaintiff now maintains that these were inaccurate overstatements of her findings.  Defendant Tighe further testified that her findings were confirmed by the existence of debris on both the crime-scene hair-fragment and Plaintiff's control hair-fragment, which Plaintiff now maintains is scientifically baseless.  At trial, however, Plaintiff offered no rebuttal expert testimony.

6

Plaintiff also testified at trial.  He said that he was with Susan Ruble at a Wrightstown motel when the murder occurred. However, the motel records presented at trial did not reflect a room registered to Plaintiff or Ruble for that night.  (Plaintiff now suggests that BCPO officials failed to investigate Ruble's September 9, 1987 statement that she and Plaintiff had registered under a different name.)  On direct-examination, Ruble initially corroborated Plaintiff's account, but on cross-examination she conceded that she was unsure of the date on which she and Plaintiff had stayed at the motel.

The jury returned a guilty verdict.

**C.**   **Exoneration of Plaintiff**

In July 2002, Plaintiff, represented by the Innocence Project, filed a motion seeking post-conviction relief under a newly enacted statute, N.J. Stat. Ann. 2A:84A-32a, which created a procedural mechanism for obtaining DNA testing of evidence that might be probative of guilt or innocence.  BCPO, which by then was led by Defendant Robert Bernardi, opposed Plaintiff's motion, and on January 31, 2003, Judge Sullivan denied it.  On appeal, however, the Appellate Division reversed Judge Sullivan and ordered the DNA testing.  State v. Peterson, 364 N.J. Super. 387, 836 A.2d 821 (App. Div. 2003).

On January 30, 2004, evidence samples were submitted to the Serilogical Research Institute ("SERI") for DNA testing.  In

December 2004 and February 2005, SERI reported that the samples (including hair samples that were said to have microscopically "compared" to Plaintiff's hair) did not match Plaintiff's DNA profile.  The testing of semen taken from the victim's body yielded matches for Sutton and Walley, which was consistent with BCPO's report that they both had consensual sex with Harrison in the hours before her murder.  The testing also yielded evidence of semen belonging to a third, unidentified person whose DNA profile did not match Plaintiff's.

Based upon these results, Plaintiff moved to vacate his conviction on April 27, 2005, which BCPO did not oppose.  The motion was granted by Judge Thomas S. Smith on July 29, 2005.  Plaintiff then made bail in August 2005, pending a decision of BCPO officials as to whether to try Plaintiff a second time.  They ultimately decided against a retrial, and, at BCPO's request, an Order of Dismissal was entered on May 26, 2006.

### STANDARD OF REVIEW

Summary judgment should be granted if "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  An issue is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."

8

Id. at 250.

When deciding the existence of a genuine issue of material fact, a court's role is not to weigh the evidence: all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, "a mere scintilla of evidence," without more, will not give rise to a genuine issue for trial.  Anderson, 477 U.S. at 249.  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986).  "Summary judgment motions thus require judges to 'assess how one-sided evidence is, or what a 'fair-minded' jury could 'reasonably' decide.'"  Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary

9

judgment [has been] made, the adverse party 'must set forth
specific facts showing that there is a genuine issue for trial.'"
Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).  The
non-movant's burden is rigorous: it "must point to concrete
evidence in the record"; mere allegations, conclusions,
conjecture, and speculation will not defeat summary judgment.
Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir.
1995).

## DISCUSSION

     Plaintiff brings this action pursuant to 42 U.S.C. § 1983,
which provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . . ,
> subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Notwithstanding the statute's imposition of
liability to "[e]very person", courts have limited its
application according to common-law immunities recognized at the
time of its 1871 enactment.  Burns v. Reed, 500 U.S. 478, 484
(1991) (citing Pierson v. Ray, 386 U.S. 547, 554 (1967)).
Specifically, courts have applied two kinds of immunities in §
1983 actions: qualified immunity and absolute immunity.  Yarris
v. County of Delaware, 465 F.3d 129, 135 (3d Cir. 2006).  Most
public officials are entitled only to qualified immunity, which

operates to shield them from suit for their good-faith conduct. Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). Absolute immunity protects officials who perform certain special functions -- like judges, prosecutors, and witnesses -- because it is thought that these functions should be carried out free from the threat of litigation. Yarris, 465 F.3d at 135. However, "the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns, 500 U.S. at 486. Here, all individual Defendants assert the protection of qualified immunity, while Defendants Tighe and Bernardi also assert the protection of absolute immunity for their respective roles as witness and prosecutor. The Court will address each in turn.[4]

**A.   Defendants Serafin, Fitz-Patrick, and King**

Defendants Serafin, Fitz-Patrick, and King, the BCPO investigators, seek summary judgment on the ground that they are protected by qualified immunity. Qualified immunity shields officials from suit for their objectively reasonable conduct. See Pearson v. Callahan, 129 S. Ct. 808, 815 (2009). The

---

[4] Defendants BCPO and the State of New Jersey, as well as all Defendants named in their official capacities, are not amenable to suit for damages under the doctrine of sovereign immunity. Seminole Tribe v. Florida, 517 U.S. 44, 54 (1996); Kentucky v. Graham, 473 U.S. 159, 165-67 (1985). Because Plaintiff does not dispute this proposition, the Court need not discuss it further. (Pl.'s Opp'n Br. at I.) Accordingly, summary judgment will be granted on this ground.

doctrine operates "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 740 (2002).  Thus, qualified immunity protects officials when they may have acted upon reasonable errors, whether mistakes of law or fact.  Pearson, 129 S. Ct. at 815.

The Supreme Court has suggested a two-step inquiry to determine whether a defendant-official is entitled to the protection of qualified immunity:  "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right.  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  Id. at 816 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).[5]  Importantly, when conducting this inquiry on summary judgment, courts must view all facts and reasonable inferences in the light most favorable to the plaintiff.  See Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009) ("The District Court was required to view the facts in the light most favorable to the plaintiff."); Halpin v. Camden, 310 F. App'x 532, 534 n.1 (3d Cir. 2009) (requiring district courts

---

[5] While the two-step inquiry is no longer mandatory, it continues to provide a useful framework for conducting a qualified immunity analysis.  Brandt v. Monte, 626 F. Supp. 2d 469, 485 (D.N.J. 2009) (citing Pearson, 129 S. Ct. at 815-16).

to credit a plaintiff's version of the facts).

### 1. <u>Violation of Constitutional Right</u>

<u>First</u>, has Plaintiff shown a violation of a constitutional right?  Plaintiff asserts a claim for malicious prosecution. (Pl.'s Opp'n Br. 14-15.)[6]  He argues that Defendants Serafin, Fitz-Patrick, and King caused his arrest and prosecution without probable cause, in violation of his Fourth Amendment right to be free from unreasonable seizures.  <u>See</u> <u>Gallo v. City of Philadelphia</u>, 161 F.3d 217, 222 (3d Cir. 1998) (holding that a malicious prosecution claim is grounded in the Fourth Amendment concept of "seizure").  To prove this claim, Plaintiff must show that:

> (1) [D]efendant[s] initiated a criminal proceeding;

---

[6] Actually, Plaintiff has not clearly articulated what constitutional torts he alleges in this action.  His Amended Complaint is an unhelpful laundry-list of claims, many of which are not legally cognizable.  However, his summary judgment papers characterize his cause of action against Defendants Serafin, Fitz-Patrick, King, and Tighe as malicious prosecution claims, so going forward Plaintiff will be bound by this theory of liability.  <u>See</u> <u>Ryan Operations G.P. v. Santiam-Midwest Lumber Co.</u>, 81 F.3d 355, 358 (3d Cir. 1996) ("[Judicial estoppel] is designed to prevent litigants from playing fast and loose with the courts." (citation omitted)).

Notably, the Third Circuit has held that post-conviction incarceration is not a "seizure" within the meaning of the Fourth Amendment.  <u>Donahue v. Gavin</u>, 280 F.3d 371, 381-83 (3d Cir. 2002).  It is not disputed, however, that the arrest and indictment of Plaintiff resulted in pre-conviction incarceration. It appears to be an open question whether recovery for post-conviction incarceration is possible on a malicious prosecution claim if the claim asserts a deprivation of procedural due process.  <u>Backof v. New Jersey State Police</u>, 92 F. App'x 852, 856 n.6 (3d Cir. 2004).

> (2) the criminal proceeding ended in [P]laintiff's favor;
> (3) the proceeding was initiated without probable cause;
> (4) [D]efendants acted maliciously or for a purpose other
> than bringing [P]laintiff to justice; and
> (5) [P]laintiff suffered a deprivation of liberty
> consistent with the concept of seizure as a consequence
> of a legal proceeding.

Camiolo v. State Farm Fire and Casualty Co., 334 F.3d 345, 362-

363 (3d Cir. 2003) (citing Estate of Smith v. Marasco, 318 F.3d

497, 521 (3d Cir. 2003)).  Of these elements, it is not disputed

that: (a) Defendants Serafin, Fitz-Patrick, and King initiated a

criminal proceeding, (b) which ended in Plaintiff's favor, and

(c) which caused Plaintiff to suffer a deprivation of liberty.

Defendants dispute only the absence of probable cause (the third

element) and their malicious intent (the fourth element).

    Starting with the fourth element, Plaintiff offers ample

evidence suggesting malicious intent.  According to Plaintiff,

Defendants Fitz-Patrick and King procured Elder's false testimony

by repeatedly confronting him at his workplace and home,

threatening to prosecute him for the crime, interrogating him for

prolonged periods, and feeding to him information about the crime

by repeating nonpublic details within his earshot.  (Pl.'s Opp'n

Br. 16-18.)  In turn, Defendant Serafin exaggerated Elder's

statement before the grand jury by saying that Elder had heard

Plaintiff confess to the crime, which Elder had not in fact

14

claimed.[7]  (<u>Id.</u>)  Furthermore, Defendants Fitz-Patrick, Serafin, and King failed to pursue important investigatory leads, including, <u>inter alia</u>, not interviewing three individuals who sold Harrison cocaine hours before the murder.  (<u>Id.</u>)  From this evidence, a reasonable jury could conclude that Defendants Serafin, Fitz-Patrick, and King, acting together and with malicious intent, fabricated a case against Plaintiff.

In light of this evidence, a reasonable jury could further conclude that Defendants Serafin, Fitz-Patrick, and King brought about Plaintiff's arrest and prosecution without probable cause -- the only other disputed element.  Defendants argue that the evidence untainted by Plaintiff's claims of misconduct is enough to establish probable cause.  For example, Plaintiff had scratches on his arms and a history of violence against women; he refused to submit to a polygraph examination, was present near the crime scene, and could not provide a verifiable alibi.

The Court cannot excise from the record the evidence favorable to Plaintiff's position.  Even if the untainted evidence considered in isolation amounts to probable cause, a jury believing that Defendants Serafin, Fitz-Patrick, and King

---

[7] Plaintiff cites Defendant Serafin's grand jury testimony only as evidence of Defendants' motives for their non-testimonial conduct.  Plaintiff does not seek to impose liability upon Defendant Serafin for testifying falsely.  (Defendant Serafin is, of course, subject to absolute immunity for the content of his grand jury testimony, <u>see</u> discussion <u>infra</u>.)

maliciously fabricated a case against Plaintiff could still reasonably conclude, viewing <u>all</u> evidence in its totality, that BCPO officials proceeded against Plaintiff maliciously and without probable cause.  All Circuit Courts to consider the question have unanimously held that evidence of malice -- that is, misrepresentation, withholding, or falsification of evidence, fraud, perjury, or other bad-faith conduct -- is itself probative of a lack of probable cause.  <u>See</u> <u>Moore v. Hartman</u>, 571 F.3d 62, 67 (D.C. Cir. 2009) (collecting cases holding that evidence of malice rebuts the presumption of probable cause that accompanies an indictment).  The Court therefore rejects Defendants' contention that Plaintiff cannot establish an absence of probable cause.  Viewing all facts and reasonable inferences in Plaintiff's favor, as the Court must, Plaintiff has established at this juncture of the proceedings that Defendants Serafin, Fitz-Patrick, and King violated his constitutional right.

## 2. <u>Clearly Established</u>

<u>Second</u>, was the constitutional right at issue clearly established?  The initial answer is straightforward:  "Falsifying facts to establish probable cause to arrest and prosecute an innocent person is of course patently unconstitutional . . ." <u>Hinchman v. Moore</u>, 312 F.3d 198, 205-06 (6th Cir. 2002) (citing <u>Hill v. McIntyre</u>, 884 F.2d 271, 275 (6th Cir. 1989)).  Although the law has evolved in recent years, it cannot seriously be

disputed that the misconduct with which Defendants Serafin, Fitz-Patrick, and King are charged -- that is, fabricating a case against Plaintiff -- clearly violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure in 1987 and 1988.  See Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995) ("[T]he right to be free from arrest except on probable cause, was clearly established [in 1988 and 1989].").

This observation does not end the inquiry, however.  When law enforcement officers "reasonably but mistakenly conclude that probable cause to make an arrest is present," qualified immunity forecloses second-guessing of their determination by civil courts.  Id.  In other words, the Court must decide whether officers in the position of Defendants Serafin, Fitz-Patrick, and King, in reliance upon a reasonable misperception of the facts, could have found probable cause.  Pearson, 129 S. Ct. at 815; see, e.g., Gilles v. Davis, 427 F.3d 197, 206 (3d Cir. 2005) (applying qualified immunity because "reasonable minds could disagree" on whether a confrontational and insulting speech was likely to provoke violent retaliation).  Two principles cabin this more specific inquiry: first, the Court accepts Plaintiff's well supported allegations as true, Giles, 571 F.3d at 326, and second, the inquiry is fact-specific but objective, Karnes v. Skrutski, 62 F.3d 485, 491 (3d Cir. 1995), abrogated on other grounds by, Curley v. Klem, 499 F.3d 199 (3d Cir. 2007).  The

17

inquiry can thus be restated this way:  Is it consistent with
Plaintiff's account of the facts that reasonable officers in
Defendants' position could have believed that probable cause was
present?

Defendants maintain that reasonable officers could have
found probable cause in such undisputed inculpating facts as the
scratches on Plaintiff's arms, his history of violence against
women, and his inability to provide a verifiable alibi.  This
evidence, however, tells only part of the story.  Plaintiff has
offered evidence to suggest that Defendants Serafin, Fitz-
Patrick, and King, acting with malicious intent, purposefully
manipulated the evidence against him.  Because the Court assumes
the truth of this allegation, it must ask if a hypothetical
officer who is purposefully manipulating evidence to construct a
false case could reasonably believe that probable cause was
present.  The answer must be "no".[8]  While the complex doctrine
of qualified immunity presents many close questions, all agree

_____

[8] The Court acknowledges the counterintuitive possibility
that an officer believing in the presence of probable cause could
nonetheless fabricate evidence to further strengthen an already
strong prosecutorial case.  Although this possibility suggests
that the purposeful manipulation of evidence is not necessarily
at odds with an objectively reasonable finding of probable cause,
the doctrine of qualified immunity must not be expanded to
absolve objectively bad actors.  See Hope, 538 U.S. at 745-46
(holding that qualified immunity does not shield officers whose
"degrading and dangerous" conduct "obviously" violates
constitutional protections, even when the law is unsettled)
(citing United States v. Lanier, 520 U.S. 259, 271 (1997)).

18

that it affords no protection to "the plainly incompetent [and] those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).  Because Plaintiff's allegation that Defendants Serafin, Fitz-Patrick, and King "knowingly violate[d] the law" is the core disputed fact of this litigation, qualified immunity is not available at summary judgment here.[9]

**B.   Defendant Tighe**

Defendant Tighe seeks summary judgment on grounds that she is entitled to absolute immunity for her expert testimony at Plaintiff's trial, and qualified immunity for her role in investigating the Harrison murder.

---

[9] Defendants employ the phrase "arguable probable cause" in support of their qualified immunity claim.  This language has not been adopted by the Supreme Court or the Third Circuit. "Arguable probable cause" is a confusing construct, because it suggests that qualified immunity is available whenever fairminded officers may disagree on the presence of probable cause.  As this Court has previously explained,

> Qualified immunity does not turn upon what an average officer thinks may be reasonable.  Rather, courts presume that the reasonable officer is familiar with clearly established legal rules.  Thus, when the law governing a particular course of conduct is clearly established, the reasonable officer, <u>ipso</u> <u>facto</u>, will not err in determining the law's requirements.  In other words, there is no "room for disagreement" about what the law requires when the law is clearly established.

<u>Rab v. Borough of Laurel Springs</u>, No. 08-2413, 2009 WL 5174641, *5 n.4 (D.N.J. Dec. 18, 2009) (citing <u>Walczyk v. Rio</u>, 496 F.3d 139, 166-69 (2d Cir. 2007)).  Of course, when application of the law to a unique factual scenario is unsettled, or when officers correctly apply the law to reasonably misperceived facts, qualified immunity excuses constitutional torts.  <u>Pearson</u>, 129 S. Ct. at 815.

1.   **Absolute Immunity**

It is not disputed that Defendant Tighe bears no liability for statements made as a witness in the criminal trial.[10]  It is well established that "[w]itnesses, including public officials and private citizens, are immune from civil damages based upon their testimony." Hughes v. Long, 242 F.3d 121, 125 (3d Cir. 2001) (citing Briscoe v. LaHue, 460 U.S. 325, 341, 345-46 (1983)).  The immunity is absolute. Briscoe, 460 U.S. at 345. It applies equally to the testimony of "ordinary citizens" and law enforcement officials, including "coroners, medical examiners, psychiatric experts, and social workers." Id. at 342 n.27.  Moreover, the Supreme Court adopted the immunity mindful that it would shield even witnesses who give knowingly false testimony to unjustly convict an innocent criminal defendant. Id. at 345.  Of these cases, the Court said, "In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." Id. (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950)).  Therefore, Defendant Tighe, regardless of her motivations or truthfulness, is absolutely immune for her testimony at Plaintiff's trial.

---

[10] Plaintiff omitted this issue from his opposition brief. (Pl.'s Opp'n Br. 21-23.)

## 2.   <u>Qualified Immunity</u>

The applicability of qualified immunity to Defendant Tighe's investigative role requires more analysis.  Absolute immunity insulates a witness from liability only for her testimony, not her out-of-court conduct.  <u>Moldowan v. City of Warren</u>, 578 F.3d 351, 390 (6th Cir. 2009).  Qualified, rather than absolute, immunity therefore governs the investigative conduct of a law enforcement official like Defendant Tighe.  <u>Id.</u>

Defendant Tighe's non-testimonial, investigative conduct is at issue here.  Specifically, Plaintiff contends that Defendant Tighe intentionally exaggerated her findings when working in cooperation with Defendants Serafin, Fitz-Patrick, and King, to strengthen their growing case against Plaintiff.  (Amd. Compl. ¶¶ 26, 30.)  As evidence for this allegation, Plaintiff points to the similar overstatement of the scientific findings made first by Defendant Serafin before the grand jury and then by Defendant Tighe at trial.  (<u>Id.</u>)  Plaintiff further points to Defendant Serafin's own admission that his erroneous grand jury testimony was attributable to information he had received, directly or indirectly, from Defendant Tighe.  (Pl.'s Opp'n Br. 22-23.)  From these facts, Plaintiff infers that Defendant Tighe worked with BCPO investigators to procure his indictment by fraud.  (<u>Id.</u>)

The applicability of qualified immunity to Defendant Tighe can be determined at the first analytical step.  <u>See</u> <u>Saucier</u>, 533

21

U.S. at 201 ("First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."). Although Plaintiff sweeps Defendant Tighe in with the BCPO investigators, he lacks evidence to satisfy the elements of a malicious prosecution claim. Specifically, Plaintiff cannot show that the initiation of a criminal proceeding resulted from Defendant Tighe's alleged misconduct, nor that she acted maliciously. See Camiolo, 334 F.3d 362-63 (defining the elements of a malicious prosecution claim).

The factual basis for Plaintiff's allegations against Defendant Tighe is, at best, dubious. A party opposing a properly supported summary judgment motion bears the rigorous burden of "point[ing] to concrete evidence in the record" that establishes a genuine issue of material fact. Orsatti, 71 F.3d at 484. Here, importantly, Plaintiff has not alleged that Defendant Tighe's scientific report was faulty; he alleges only that Defendants Tighe and Serafin exaggerated the report's findings to fraudulently procure Plaintiff's indictment and ultimate conviction.

But what "concrete evidence" suggests that misconduct by Defendant Tighe caused Plaintiff's arrest and indictment? Plaintiff points to the deposition testimony of Defendant Serafin stating that his mischaracterization of the scientific report was

22

likely attributable to misinformation from Defendant Tighe,

although he did not recall ever speaking with her.  (Serafin

Dep., Oct. 7, 2009, at 103:5-19 [Pl.'s Ex. 4].)[11]  The leap from

this testimony to the conclusion that, not only did they speak,

but they in fact conspired with one another, is far too

attenuated to constitute a reasonable inference.  See Matsushita

Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587

(1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458,

460 (3d Cir. 1989) (quoting Anderson, 477 U.S. at 265);

Franulovic v. Coca-Cola Co., No. 07-0539, 2009 WL 1025541, *6-7

(D.N.J. Apr. 16, 2009).[12]

---

[11] The deposition transcript reads, in relevant part:

> Q.   . . . You weren't sure if you had direct
>      conversation with Miss Tighe before you walked
>      into the Grand Jury room or not?
> A.   I was not.
> Q.   However, the concept that when they say
>      compare means identical you were confident
>      came from Miss Tighe either through you or
>      through one of your [Technical Service Unit
>      personnel]?
> A.   Correct. . . . I don't recall ever speaking
>      with her, so I may not have known her name.  I
>      don't know her name now and I may not have
>      known her name then.
> Q.   Got you.
> A.   So, any conversation that I had in regard to
>      the samples, the hair samples, et cetera, was
>      more than likely between myself and Technical
>      Services Unit personnel.

(Serafin Dep., Oct. 7, 2009, at 103:5-19 [Pl.'s Ex. 4].)

[12] In his opposition brief, Plaintiff appears to retreat
from his accusation of a conspiracy between Defendants Tighe and
Serafin levied in his Amended Complaint.  (Compare Pl.'s Opp'n
Br. 21-23, with Amd. Compl. ¶¶ 26, 30.)  If Plaintiff's theory of

Similarly, what "concrete evidence" suggests that Defendant Tighe acted with malicious intent?  Plaintiff ties together Defendants Serafin and Tighe with the loose thread that they both drew the same overstated conclusion from the scientific report (before the grand jury and at the trial, respectively).  (Amd. Compl. ¶ 26, 30.)  In fact, Defendant Tighe's primary error at trial was her failure to correct the questioning prosecutor's overstated characterization of her findings.  (Trial tr., Mar. 6, 1989, at 152:14-18 [Pl.'s Ex. 26].)  A witness's failure to testify with perfect precision does not, without more, evidence malicious intent.  See Anderson, 477 U.S. at 249 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

In short, Plaintiff cannot satisfy the elements of a malicious prosecution claim against Defendant Tighe without relying upon conjecture and speculation.  This is insufficient to

---

causation does not rely upon a conspiracy between Defendants Tighe and Serafin -- if it instead relies upon a chain of misinformation from Defendant Tighe, to Technical Service Unit personnel, to Defendant Serafin, and finally to the prosecutor -- then Plaintiff would certainly fall short of establishing Tighe's malicious intent.

This theory of causation would further be inadequate to satisfy the causation element of a malicious prosecution claim, because there must be a showing that the misconduct significantly contributed to the decision to prosecute.  Sanders v. English, 950 F.2d 1152, 1162-64 (5th Cir. 1992).  Plaintiff has made no showing that the prosecutorial decision was in reliance upon misinformation from Defendant Tighe.

defeat a motion for summary judgment.  Thus, because Plaintiff cannot establish a constitutional violation, Defendant Tighe is entitled to qualified immunity for her investigatory conduct.[13]

### C.   Defendant Bernardi

Defendant Bernardi, Burlington County's lead prosecutor during the post-conviction proceedings that ultimately led to dismissal of Plaintiff's conviction, likewise asserts the protections of absolute and qualified immunity.  Plaintiff faults Defendant Bernardi for two decisions: (1) his instruction to resist Plaintiff's efforts to obtain DNA testing, particularly in the context of Plaintiff's July 2002 motion for post-conviction relief; and (2) his unwillingness to consent to dismissal of Plaintiff's conviction immediately upon receiving the DNA results in early 2005.  (Pl.'s Opp'n Br. 4.)

The Court begins by noting that it is not clear what constitutional right Plaintiff alleges that Defendant Bernardi violated.[14]  Plaintiff makes no allegation that Defendant

---

[13] Furthermore, Defendant Tighe is entitled to qualified immunity because her mischaracterization of the evidence appears to have been a reasonable mistake of fact.  See Pearson, 129 S. Ct. at 815 (holding that qualified immunity insulates such fact-mistakes from liability).  Based upon the evidence of record, the Court has no reason to doubt that Defendant Tighe's overstatement was a product of her understandable confidence in the quality of the prevailing scientific standards of the day.  Plaintiff has not offered any evidence to the contrary.  While the benefit of two decades of scientific progress has enabled Plaintiff's criticism, qualified immunity forecloses such second-guessing.

[14] See supra note 6.

Bernardi participated in obtaining his arrest, indictment, or conviction.  Rather, he faults Defendant Bernardi only for <u>prolonging</u> his incarceration.  The Court will therefore treat his claim as one for false imprisonment.  <u>Compare</u> <u>Wilson v. Russo</u>, 212 F.3d 781, 792-93 (3d Cir. 2000) (discussing continued incarceration as a Fourth Amendment violation); <u>Moore v. Tartler</u>, 986 F.2d 682 (3d Cir. 1993) (discussing prolonged detention as an Eighth Amendment violation).  It is far from clear that Plaintiff's allegations against Defendant Bernardi state a cognizable claim for the constitutional tort of false imprisonment; since neither party has raised or briefed this issue, however, the Court's discussion will proceed upon the assumption that Plaintiff's allegations satisfy the elements of this claim.[15]

### 1.  **Absolute Immunity**

Defendant Barnardi contends, first, that absolute prosecutorial immunity forecloses Plaintiff's claims against him. Like witnesses, prosecutors are absolutely immune from suit for their conduct in performing their traditional function.  <u>Imbler v. Pachtman</u>, 424 U.S. 409, 421 (1976).  The immunity is circumscribed, however.  The Third Circuit has explained:

---

[15] The Court is unsure of why Defendant Bernardi did not raise this issue early on by way of a Rule 12(b)(6) motion to dismiss, or in this summary judgment motion.  Plaintiff's failure to clearly articulate his claim against Defendant Bernardi has undoubtedly contributed to the muddled litigation of this claim.

A prosecutor bears the heavy burden of establishing
entitlement to absolute immunity.  In light of the
Supreme Court's quite sparing recognition of absolute
immunity to § 1983 liability, we begin with the
presumption that qualified rather than absolute immunity
is appropriate.  To overcome this presumption, a
prosecutor must show that he or she was functioning as
the state's advocate when performing the action(s) in
question.  This inquiry focuses on the nature of the
function performed, not the identity of the actor who
performed it.  Under this functional approach, a
prosecutor enjoys absolute immunity for actions performed
in a judicial or quasi-judicial capacity.  Thus, immunity
attaches to actions intimately associated with the
judicial phases of litigation, but not to administrative
or investigatory actions unrelated to initiating and
conducting judicial proceedings.

Odd v. Malone, 538 F.3d 202, 207-08 (3d Cir. 2008) (citations and

quotations omitted).  The core prosecutorial function, which is

insulated from liability by absolute immunity, includes all "acts

undertaken by a prosecutor in preparing for the initiation of

judicial proceedings or for trial, and which occur in the course

of his role as an advocate for the State."  Buckley v.

Fitzsimmons, 509 U.S. 259, 273 (1993).  In determining whether a

particular course of prosecutorial conduct is related to this

core function, courts must "look beyond the labels a prosecutor

attaches to his or her actions and examine their underlying

ends."  al-Kidd v. Ashcroft, 580 F.3d 949, 962 (9th Cir. 2009).

In other words, when distinguishing between advocative conduct

that is intimately associated with the judicial phases of

litigation, on the one hand, and administrative or investigatory

conduct, on the other hand, courts must inquire into both the

27

nature of the conduct at issue and the prosecutor's purpose in undertaking such conduct.  See Odd, 538 F.3d at 210 ("[P]rosecutorial immunity analysis focuses on the unique facts of each case and requires a careful dissection of the prosecutor's actions.").

The body of precedents defining and applying prosecutorial immunity offers only limited guidance for deciding close cases. Courts have acknowledged and struggled with the conceptual limitations of distinguishing between a prosecutor's advocative and administrative acts.  "After all, . . . almost any action by a prosecutor, including the dispatch of purely administrative tasks, can be said to be in some way related to more central prosecutorial functions."  Id. at 213 (citing Burns, 500 U.S. at 495; Rivera v. Rivera-Cruz, 55 F.3d 26, 29 (1st Cir. 1995)). Although courts have identified various indicia of advocative acts, no single rule has proven to be a consistent and precise delineator of the two sorts of prosecutorial conduct.  See Odd, 538 F.3d at 210 ("It is tempting to derive bright-line rules from the [prosecutorial immunity] cases.  To preserve the fact-based nature of the inquiry, however, the Supreme Court has cautioned against such categorical reasoning." (citations omitted)).  Not even advocacy in court before a judge has been held to be an absolute benchmark of a prosecutor's traditional advocative role. See Odd, 538 F.3d at 210 ("We have rejected bright-line rules

that would treat the timing of the prosecutor's action (e.g. pre-
or postindictment), <u>or its location (i.e. in- or out-of-court)</u>,
as dispositive." (emphasis added)); <u>see, e.g.</u>, <u>Bernard v. County
of Suffolk</u>, 356 F.3d 495, 504-05 (2d Cir. 2004) (holding that
absolute immunity does not cover prosecutions that are not
authorized by the controlling statutes).

Despite the doctrine's murkiness, one consistent theme
emerges from the cases:  Courts have found absolute immunity to
apply when there is a <u>close nexus</u> between the conduct at issue
and the prosecutor's traditional advocative role.  <u>See, e.g.</u>, <u>id.</u>
at 211 (describing non-immune conduct as that which is "far
removed from the 'judicial phases of litigation'"); <u>id.</u> at 212
(distinguishing the conduct of two prosecutors on grounds that
one was "more 'intimately associated with the judicial phase of
the criminal process'").  In other words, as the relationship
between the conduct at issue and the traditional job of
prosecuting offenders in court grows increasingly attenuated, the
reach of prosecutorial immunity diminishes.  Accordingly, the
Court must decide whether the conduct underlying the claims
against Defendant Bernardi is closely related to the traditional
role of prosecuting offenders in court.[16]

---

[16] The Supreme Court granted certiorari in a case this term
to clarify the law.  <u>Pottawattamie County v. McGhee</u>, 129 S. Ct.
2002 (2009).  However, the case settled after oral argument and
certiorari was dismissed.  130 S. Ct. 1047 (2010).

### a.   <u>Instruction to Oppose July 2002 Motion</u>

The Court first considers Defendant Bernardi's alleged instruction to resist Plaintiff's efforts to obtain DNA evidence-testing, particularly in the context of Plaintiff's July 2002 motion seeking relief under New Jersey's newly enacted statute, N.J. Stat. Ann. § 2A:84A-32a.  The statute itself specifies the prosecutor's role:

> Notice of the motion [for the performance of forensic DNA testing] shall be served on the Attorney General, the prosecutor in the county of conviction, and if known, the governmental agency or laboratory holding the evidence sought to be tested.  Responses, if any, shall be filed within 60 days of the date on which the Attorney General and the prosecutor are served with the motion, unless a continuance is granted.   The Attorney General or prosecutor may support the motion for DNA testing or oppose it with a statement of reasons and may recommend to the court that if any DNA testing is ordered, a particular type of testing be conducted.

N.J. Stat. Ann. § 2A:84A-32a(a)(2).  Notably, the statute privileges three parties to be heard on a convicted person's request for DNA testing: the Attorney General, the prosecutor, and the evidence custodian.  The prosecutor's interest in such a motion, as distinguished from the interests of the Attorney General and evidence custodian, is in preserving the integrity of the conviction it obtained.  Here, the Court presumes that pursuit of this interest was Defendant Bernardi's reason for instructing subordinates to oppose Plaintiff's July 2002

30

motion.[17]

Again, Defendant Bernardi's conduct in issuing the
instruction to resist DNA testing is entitled to absolute
immunity only if the conduct is closely related to the job of
prosecuting offenders in court.  With this in mind, the Court
examines the relation of the traditional prosecutorial role to
three aspects of Defendant Bernardi's alleged conduct: its
context, execution, and purpose.

First, the conduct's context:  Plaintiff's July 2002 motion,
although labeled a motion for post-conviction relief, was far
removed from his conviction.  While prosecutors are absolutely
immunized for their conduct attendant to post-trial motions and
appeals, Parkinson v. Cozzolino, 238 F.3d 145, 152 (2d Cir.
2001), the proceeding here lacked the immediate relatedness to a
conviction of a post-trial motion or appeal.  Plaintiff brought
the motion 13 years after his conviction; and the relief sought
was only to examine evidence, not to reverse a conviction (a much
closer call).

Second, the conduct's execution:  Plaintiff seeks to show at
trial not that Defendant Bernardi made arguments in court
opposing the July 2002 motion, as he is permitted to do under the

---

[17] Unfortunately, the parties did not provide as an exhibit
the brief submitted by BCPO in opposition to Plaintiff's July
2002 motion.  This document is therefore not part of the record
on which the Court may determine Defendant Bernardi's purposes in
instructing subordinates to oppose the motion.

statute, but rather that he directed his subordinates to resist Plaintiff's efforts to obtain DNA testing of the evidence used at trial.  Although supervisory conduct may often be entitled to absolute immunity, here it constitutes yet one more degree of attenuation between the conduct at issue and a prosecutor's traditional advocative function.  <u>Compare</u> <u>Houston v. Partee</u>, 978 F.2d 362, 366 (7th Cir. 1992) ("[T]here is a critical distinction between such cases and this case: The defendant prosecutors in this case were not involved in the post-conviction proceedings; that is, they were not personally prosecuting the appeal.").  By all accounts, Defendant Bernardi was not "personally involved" in the post-conviction proceeding.  <u>Yarris</u>, 465 F.3d at 138.  In fact, the parties dispute the extent of Defendant Bernardi's involvement in formulating BCPO's response to the July 2002 motion.  Notably, Plaintiff had sought DNA testing by other means prior to July 2002.  <u>See</u> <u>Peterson v. Burlington County</u>, Civil No. 01-5790 (D.N.J.) (stayed on June 28, 2002).  If Defendant Bernardi's instruction to resist the DNA testing was not a specific response to the July 2002 motion, this would constitute yet a further degree of removal from his advocative role.[18]

Third, Defendant Bernardi's purpose:  "After a conviction is

_____

[18] To the extent that the particular contours of Defendant Bernardi's conduct are not clear to the Court, this cuts against his claim of prosecutorial immunity, since it is his "heavy burden" to establish his entitlement to the immunity.  <u>Odd</u>, 538 F.3d at 207.

obtained, the challenged action must be shown by the prosecutor

to be part of the prosecutor's continuing personal involvement <u>as</u>

<u>the state's advocate</u> . . . to be encompassed within that

prosecutor's absolute immunity from suit." <u>Yarris</u>, 465 F.3d at

137 (emphasis added).  Thus, a prosecutor who opposes a motion

for post-conviction relief for purposes other than advocacy for

the state -- say, to protect a friend he believes to be the

crime's true perpetrator -- would not be performing a traditional

prosecutorial function.[19]  <u>See al-Kidd</u>, 580 F.3d at 962

(requiring examination of a prosecutor's "underlying ends").  As

previously discussed, the prosecutor's interest in being heard on

a DNA testing request is to preserve the integrity of the

conviction it obtained.  The Court must therefore consider

whether a prosecutor acting to obstruct a post-conviction inquiry

for the sole purpose of preserving the conviction's integrity is

serving a truly prosecutorial purpose.

Where it is shown that a post-conviction inquiry will be

genuinely probative (because, for example, new evidence has come

to light), a prosecutor's interest, at least initially, in

preserving a conviction's integrity may be in tension with the

---

[19] Whether this, alone, would defeat a prosecutor's
entitlement to absolute immunity is not before the Court today.
<u>See al-Kidd</u>, 580 F.3d at 963 ("As a common law court, we can rule
only on the case before us.").

interest of the public in convicting and punishing the guilty.[20] Because a prosecutor's advocacy in these cases is on his own behalf, his purpose is more administrative than genuinely prosecutorial. This is yet a third degree of attenuation between Defendant Bernardi's conduct and his advocative role.

Despite this marked attenuation, Defendant Bernardi insists that his conduct's procedural context -- that is, responding to a motion for post-conviction relief in court -- places the conduct squarely within the traditional judicial/quasi-judicial prosecutorial function. In Yarris, the Third Circuit held that the decision of prosecutors to deny requests for the testing of DNA evidence was not a prosecutorial function entitled to absolutely immunity. 465 F.3d at 138. The only material difference here is that Defendant Bernardi's prosecutorial decision may have been made in the context of a motion for post-conviction relief. The fortuitous fact that Plaintiff filed a motion, rather than requesting DNA testing from Defendant Bernardi directly, does not alter the conclusion that such determinations are not traditionally advocative in nature.

---

[20] Of course, prosecutors are not interested in continuing to incarcerate the innocent. Accord Berger v. United States, 295 U.S. 78, 88 (1935) ("[The prosecutor's interest] is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer."). But when confronted with a request to scrutinize a long-settled conviction, the prosecutor's interest is in preserving its hard-fought guilty verdict.

Entitlement to prosecutorial immunity cannot turn upon the accident-of-fate that Plaintiff happened to request relief from a court, rather than from Defendant Bernardi directly.

The applicability of prosecutorial immunity here is a close and difficult call on which reasonable minds may differ.  It is certainly counterintuitive that a prosecutor's conduct in defending a conviction on appeal is immunized, but his conduct in responding to a motion for post-conviction relief may not be. The manifest conclusion of the controlling cases is that the relevant inquiry is one not of type, but of degree.  The precedents, in other words, turn not upon easily recognized categories or labels, but rather a measurement of conceptual proximity.  Given the attenuated connection of Defendant Bernardi's conduct -- particularly in light of its context, execution, and purpose -- with a prosecutor's traditional advocative role, Defendant Bernardi's instruction to oppose Plaintiff's July 2002 motion is not protected by absolute immunity.[21]

### b.    Delayed Response to SERI's DNA Findings

Plaintiff further faults Defendant Bernardi for not consenting to dismissal of his conviction immediately upon

---

[21] Further, Defendant Bernardi has made no argument that such conduct has historically been considered prosecutorial. This may be a failure to satisfy his burden of establishing entitlement to the immunity.  See Odd, 538 F.3d at 216.

receiving the DNA results in early 2005.  Unlike Defendant
Bernardi's July 2002 decision to resist DNA testing, his 2005
conduct was central to the traditional advocative role of a
prosecutor.

SERI produced two reports: the first report, issued on
December 14, 2004, summarized its analysis of the DNA samples
taken from the victim's body and clothing; the second report,
issued February 22, 2005, summarized its analysis of fingernail
scrapings and hairs.  (SERI Reports [Def.s' Exs. J(2)-(3)].)
Although BCPO did not dispute SERI's findings, it submitted for
testing other hairs from the crime scene to identify the unknown
semen "donor".  Defendant Bernardi acknowledged that the SERI
reports contained evidence that tended to exculpate Plaintiff.
(Def.s' Ctr.-Stat. Mat. Fcts. ¶ 49.)  Nonetheless, he refused to
immediately consent to dismissal of Plaintiff's conviction.  Two
months after SERI issued its second report, on April 27, 2005,
Plaintiff filed a motion to vacate his conviction, which BCPO did
not ultimately oppose.  BCPO did, however, request the imposition
of bail while it determined whether to retry Plaintiff.
Accordingly, on July 29, 2005, Judge Thomas S. Smith vacated
Plaintiff's conviction, imposed bail at $200,000, and remanded
Plaintiff to the Burlington County Jail.  Plaintiff made bail the
following month.  In the months that followed, BCPO continued to
investigate the Harrison murder.  It then moved, on May 26, 2006,

to dismiss Plaintiff's indictment, which the Court granted the same date.

Plaintiff complains that Defendant Bernardi did not consent to dismissal of his conviction immediately upon receipt of the exculpatory SERI reports.  Importantly, Defendant Bernardi did, ultimately, consent to dismissal of Plaintiff's conviction in July 2005.  Plaintiff faults him, however, for the five-month delay.

Defendant Bernardi's decision of whether to consent to dismissal of Plaintiff's conviction was intimately associated with his determination of whether to undertake a second prosecution of Plaintiff for the Harrison murder.  To be sure, although the SERI reports were highly exculpatory insofar as they undermined the scientific evidence used to prosecute Plaintiff, the reports did not eliminate the possibility that Plaintiff had committed the crime.  Confronted with such evidence, Defendant Bernardi had a quintessentially prosecutorial decision to make: whether to press or dismiss the charges against Plaintiff.  See Kulwicki v. Dawson, 969 F.2d 1454, 1463 (3d Cir. 1992) ("The decision to initiate a prosecution is at the core of a prosecutor's judicial role") (citing Imbler, 424 U.S. at 430-31).  Plaintiff makes no allegation that Defendant Bernardi caused the delay by, say, obstructing the investigation.  In fact, Plaintiff points to no evidence suggesting that Defendant Bernardi had any

37

direct role in conducting the investigation.  Thus, at bottom, Plaintiff faults Defendant Bernardi for waiting for an investigation to ripen before deciding how to proceed.  The delay in Defendant Bernardi's decision does nothing to deprive the decision of its traditionally prosecutorial character.  Thus, Defendant Bernardi's conduct in deciding to undertake a second prosecution of Plaintiff -- including his delay in consenting to dismissal of Plaintiff's conviction -- is protected by absolute prosecutorial immunity.

### 2.  Qualified Immunity

As previously discussed, absolute immunity insulates a prosecutor from liability only for conduct closely related to the traditional advocative role, not conduct that is administrative in nature.  Odd, 538 F.3d at 207-08.  It is therefore presumed that qualified, not absolute, immunity will govern most prosecutorial conduct.  Id.  Since the Court has held that Defendant Bernardi's instruction to resist DNA evidence-testing is not subject to absolute immunity, the question remains whether Defendant Bernardi is entitled to qualified immunity for this conduct.

The answer is straightforward:  Defendant Bernardi cannot be faulted for his errant interpretation of a novel statute, particularly where the first court to pass upon his interpretation adopted it.  Here, the controlling statute, N.J.

38

Stat. Ann. § 2A:84A-32a, was enacted on January 8, 2002, just six months before Plaintiff filed his motion for post-conviction relief.  Plaintiff's motion called upon Defendant Bernardi to interpret the statute without guidance from any prior cases, and the questions presented by the motion were matters of first impression.  If ever an area of law were not "clearly established", this area was not.  <u>See</u> <u>Brandt v. Monte</u>, 626 F. Supp. 2d 469, 490 (D.N.J. 2009) ("If this is a question of first impression, then it cannot be said that the law is well established.") (citing <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 244 n.27 (3d Cir. 2006)).  Nothing in the record suggests that Defendant Bernardi's interpretation of the statute was objectively unreasonable.  Indeed, although the Appellate Division ultimately vindicated Plaintiff's reading of the statute, the trial judge had sided with Defendant Bernardi in denying Plaintiff's motion.  Accordingly, Defendant Bernardi's decision to oppose Plaintiff's July 2002 motion for post-conviction relief is clearly protected by qualified immunity.[22]

## CONCLUSION

    For the reasons stated herein, Defendants' motion for summary judgment will be partially granted and partially denied. Defendants Tighe and Bernardi, as well as all state defendants,

---

    [22] Plaintiff all but concedes the point by omitting the issue altogether from his opposition brief.

are immune from suit.  Plaintiff's individual capacity claims

against Defendants Serafin, Fitz-Patrick, and King, however,

present issues of fact for trial.  An appropriate Order will

issue herewith.


Dated: June 15, 2010                    s/Renée Marie Bumb
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE